UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| IN RE:<br><br>JAMES A LITTLE and JAN R LITTLE,<br><br>    Debtors. | Case No. 23-00352-NGH<br><br>Chapter 11 |
|---|---|

MEMORANDUM OF DECISION

    Before the Court are motions to dismiss or convert filed by the United States Trustee and the creditors Rochelle and Robert Oxarango. Doc. Nos. 33 & 45. An evidentiary hearing was held on November 28 and 29, 2023, after which the Court took the matter under advisement. After considering the record, arguments of the parties, and applicable law, the following constitutes the Court's findings, conclusions, and disposition of the issues.

## BACKGROUND

    James and Jan Little ("Debtors") owned and operated a farming and ranch business through several different entities, collectively referred to as the "Ranch". These entities include (1) V Dot Cattle Co., LLLP ("V Dot"); (2) David Little Family LLLP, and (3) Van Deusen Ranch, Inc ("Van Deusen"). In 2009, Mr. Little began facing serious health issues, having been diagnosed with chronic obstructive pulmonary disease (COPD) and later with Parkinson's disease, and he began exploring the idea of

MEMORANDUM OF DECISION- 1

transitioning the business to the Oxarangos. Rochelle Oxarango is one of Debtors' daughters and Robert Oxarango is her husband. Robert Oxarango had been involved in ranching since 1999 and operated a large commercial sheep ranch in eastern Idaho. The Oxarangos sold their eastern Idaho ranch so they could move to the Ranch and begin transitioning the operations of the Ranch to the Oxarangos.

With the aid of a certified public accountant, Mr. Little created a plan and set the price for the Oxarangos to purchase the Ranch. In March 2012, two of Debtors' daughters sold their interests in V Dot and Van Deusen to the Oxarangos. Ex. 104. This left Mr. Little as the majority general partner of V Dot, with Rochelle and Robert both owning minority shares.

Since 2012, the Oxarangos have actively operated the Ranch, putting both money and labor into the business. In April 2015, the parties executed a purchase and sale agreement of Debtors' 493 shares of Van Deusen for approximately $579,000. Further, around the same time, the Oxarangos and Mr. Little entered into two separate option agreements for the purchase of Mr. Little's shares of V Dot and the David Little Family LLLP. Exs. 105 & 106. These agreements provided the Oxarangos the opportunity, either individually or through the Oxarango Family Trust, to purchase Mr. Little's remaining shares upon or after his death at a price of $10/share.[1]

At some point, the relationship between Debtors and the Oxarangos broke down and Debtors filed a lawsuit against the Oxarangos in the Third Judicial District of Idaho,

---

[1] Rochelle Oxarango testified that the purchase of James Little's shares in V Dot and David Little Family LLLP was structured in such a way to avoid possible negative tax consequences.

MEMORANDUM OF DECISION- 2

asserting claims of (1) constructive fraud; (2) undue influence; (3) lack of mental capacity to contract; (4) constructive trust; and (5) accounting. Ex. 303. The facts underlying the state court litigation concern the circumstances that led to the Oxarangos' involvement in Debtors' business and their subsequent operation of the business—in summary, Debtors' claim the Oxarangos coerced Mr. Little into selling them the Ranch.

In December 2022, the Oxarangos suggested Debtors dismiss the case and both parties walk away from the state court litigation bearing their own costs, but Debtors declined. Subsequently, the Oxarangos filed a motion for summary judgment in the state court litigation, which was fully briefed, argued, and submitted to the court as of May 1, 2023. *See* Ex. 305. However, at this point, Debtors proposed to voluntarily dismiss the entire action and advised the state court as such at a pretrial conference. Ex. 308 at 4–5.[2] Based on Debtors' representations, the state court stayed the decision on summary judgment and vacated the trial set to commence on July 10, 2023. *Id.* at 5.

However, Debtors ultimately did not dismiss their state court complaint, and instead hired new attorneys. On June 30, 2023, Debtors, through their attorney, sent the Oxarangos a letter, purporting to revoke the April 2015 option agreements which offered the Oxarangos the opportunity to purchase Mr. Little's interests in V Dot and the David Little Family LLLP upon his death. Subsequently, on July 14, 2023, Debtors filed a

---

[2] The Oxarangos have repeatedly asserted that Debtors were going to dismiss the action with prejudice. While the state court transcript does reflect Debtors' request for a dismissal, the only reference to a dismissal with prejudice was made by the Oxarangos' counsel.

MEMORANDUM OF DECISION- 3

voluntary chapter 11 bankruptcy case.³  Doc. No. 1.  On Debtors' schedules, Debtors list over $6 million in assets.  *Id.* at 8.  Further, Debtors list a monthly income of $11,492, with monthly expenses of approximately $7,303, leaving a monthly net income of $4,189.  Ex. 203 at 13.  Debtors list no secured or priority unsecured claims and scheduled general unsecured claims of only $132,926.98.  A significant amount of the debt scheduled is owed to entities owned by Debtors' family members—$80,00 is owed to Highland Livestock, a corporation operated by Adam Little, Mr. Little's nephew.  Ex. 201 at 27.  Further, another $3,000 is owed to Wade Reaney Training Stables, LLC, an entity owned by Debtors' son-in-law.  Ex. 201 at 28.

On September 5, 2023, Debtors initiated an adversary action against the Oxarangos, as well as Oxarango Ranch, LLC.  Case No. 23-06029-NGH, Doc. No. 1.  In the adversary action, Debtors seek a declaratory judgment that the revocation of the option agreements between Debtors and the Oxarangos was effective, and Debtors continue to be the majority owners of the David Little Family LLLP and V Dot.  Debtors also seek to avoid the transfer of a piece of property from Debtors to the Oxarangos made in November 2020.

On September 19, 2023, the United States Trustee filed a motion to dismiss or convert Debtors' bankruptcy pursuant to § 1112(b).  Doc. No. 33.  The Oxarangos likewise filed a motion to dismiss and joined in the United States Trustee's motion on

---

³ Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, all rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

MEMORANDUM OF DECISION- 4

October 24, 2023. Doc. No. 45. Creditor AgWest Farm Credit Services joined in the Oxarangos' motion on November 8, 2023. Doc. No. 67.

ANALYSIS

A.  **Motion to Dismiss**

The United States Trustee and the Oxarangos have both brought motions to dismiss or convert pursuant to § 1112. Section 1112(b)(1) provides that

> on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

The moving party must first establish cause. *In re McKay*, 2013 WL 66263, at *2 (Bankr. D. Idaho Jan. 4, 2013).

1.  **Confirmability of Chapter 11 Plan**

First, the United States Trustee argues cause exists to dismiss the bankruptcy because Debtors will likely not be able to successfully confirm a plan of reorganization. The inability to confirm a plan can constitute cause for dismissal or conversion under § 1112(b). *In re Jacobs*, 644 B.R. 883 (Bankr. D.N.M. 2022). [W]here there is no reasonable possibility of an effective reorganization, the bankruptcy court is not compelled to wait a certain period of time, to the detriment of creditors, before ordering conversion of the case." *Johnston v. Jem Dev. Co. (In re Johnston)*, 149 B.R. 158, 162 (9th Cir. BAP 1992). Conversely, the Ninth Circuit has noted that "[p]erhaps the most compelling grounds for denying a motion to dismiss grounded on bad faith is the

MEMORANDUM OF DECISION- 5

determination that a reorganization plan qualifies for confirmation." *In re Marshall*, 721 F.3d 1032, 1049 (9th Cir. 2013).

Here, given the Oxarangos' significant unsecured claim for attorneys' fees as well as their opposition to Debtors' bankruptcy filing, it appears unlikely that Debtors will be able to confirm a plan without the Oxarangos' consent. The U.S. Trustee does acknowledge that there is a possibility that Debtors could confirm a plan without the approval of the Oxarangos, depending upon the treatment of the AgWest claims.[4] However, the Court need not determine whether Debtors could ultimately confirm a plan, because the Court finds that Debtors filed this bankruptcy in bad faith.

## 2.  Bad Faith as Cause

Though § 1112(b)(4) provides many potential grounds for dismissal or conversion, it is not an exclusive list, and courts have held many other factors may constitute cause to convert or dismiss a case under § 1112(b), including a debtor's bad faith. Though a movant generally bears the burden of establishing cause under § 1112(b), once bad faith is put at issue, the debtor bears the burden of establishing that the petition was filed in good faith. *Marshall*, 721 F.3d at 1048.

Bad faith is determined on a case-by-case-basis, meaning "there is no list of factors which must be present in each case to make the finding, and the weight given to any factor depends on the circumstances of the individual case." *Legal Serv. Bureau, Inc.*

---

[4] AgWest's claims are predicated upon a debt owed by the Ranch. Debtors have a personal guarantee on such debt. However, the Oxarangos testified the Ranch is current on its payments and plans to continue paying the AgWest debt. AgWest has also filed a joinder to the Oxarango's motion to dismiss. *See* Doc. No. 67.

MEMORANDUM OF DECISION- 6

*v. Orange Cty. Bail Bonds, Inc. (In re Orange Cty. Bail Bonds, Inc.)*, 638 B.R. 137, 149 (9th Cir. BAP 2022). However, courts have looked to a variety of factors when considering the bad faith of a debtor, including:

> (1) the debtor has only one asset;
> (2) the debtor has an ongoing business to reorganize;
> (3) there are any unsecured creditors;
> (4) the debtor has any cash flow or sources of income to sustain a plan of reorganization or to make adequate protection payments; and
> (5) the case is essentially a two-party dispute capable of prompt adjudication in state court.

*St. Paul Self Storage Ltd. P'Ship v. Port Authority of St. Paul (In re St. Paul Self Storage Ltd. P'ship)*, 185 B.R. 580, 582–83 (9th Cir. BAP 1995).

Both the United States Trustee and the Oxarangos argue that Debtors are engaged in a two-party dispute with the Oxarangos and that Debtors filed this bankruptcy primarily as a litigation tactic. Of course, "all debtors file for bankruptcy in order to delay creditor action." *In re Marshall*, 721 F.3d at 1049. It is well recognized that the automatic stay is a tool used by debtors when filing for bankruptcy to obtain a "breathing spell." *Sullivan v. Harnisch (In re Sullivan)*, 522 B.R. 604, 607 (9th Cir. BAP 2014). However, when "a debtor seeks to use a chapter 11 filing to 'unreasonably deter and harass creditors,' such filing lacks good faith." *Id*. at 614–15 (quoting *In re Marsch*, 36 F.3d at 828); *see also* 7 COLLIER ON BANKRUPTCY ¶ 1112.07[5][b][i] (Richard Levin & Henry J. Sommer. eds., 16th ed. 2023) ("[T]he bare fact that the debtor desires to obtain the benefits of [the automatic stay] cannot by itself support a finding of bad faith. Rather, the debtor must intend to obtain the benefit of the automatic stay for an improper purpose."). Filing bankruptcy to delay state court proceedings may be indicative of bad

MEMORANDUM OF DECISION- 7

faith. *In re Silberkraus*, 253 B.R. 890, 905–06 (C.D. Cal. 2000) (citing several cases making such a finding).

Here, the record clearly indicates Debtors' motivation in filing bankruptcy was their dispute with the Oxarangos. Debtors filed an amended state court complaint against the Oxarangos in May 2022, asserting that the Oxarangos had fraudulently induced Mr. Little to enter into an option agreement to sell the Oxarangos Mr. Little's shares of V Dot and the David Little Family, LLLP at a significantly reduced price. Ex. 303. Debtors appeared to acknowledge that their chances of success in the state court litigation were slim—Debtors sought to dismiss the case after the Oxarangos obtained an unfavorable deposition with Mr. Little's CPA and handwritten notes from Mr. Little indicated he was aware they were in a difficult position. *See* Ex. 301.

Due to Debtors' desire to dismiss the case, the state court vacated the trial set on the matter. Ex. 308 at 5. However, Debtors took no action to dismiss the case and instead obtained new counsel. Debtors' new counsel then sent the Oxarangos letters purporting to rescind the April 2015 option agreements at issue in the state court litigation. Ex. 311. Shortly thereafter, Debtors filed this bankruptcy petition and subsequently initiated an adversary action against the Oxarangos, seeking amongst other things, a declaration that the revocation of the option agreements was effective.

MEMORANDUM OF DECISION- 8

Mr. Little also testified that Debtors filed bankruptcy in an attempt to force the dissolution and liquidation of V Dot.[5]  However, this is merely an extension of Debtors' dispute with the Oxarangos.  The Oxarangos became partners in V Dot alongside Mr. Little after Rochelle Oxarangos' sisters sold their interests to Robert Oxarango.  Ex. 104.  Further, per the option agreements signed by the parties in April 2015, the Oxarangos would have had the opportunity to purchase Mr. Little's interests in V Dot upon his death.  In filing bankruptcy to force the dissolution and liquidation of V Dot, Debtors are again attempting to unwind their dealings with the Oxarangos.

The United States Trustee and the Oxarangos also point to the fact that Debtors are solvent and do not appear to be in any financial distress.  Insolvency is not a prerequisite to filing for bankruptcy.  *Stolrow v. Stolrow's Inc (In re Stolrow's Inc.)*, 84 B.R. 167, 171 (9th Cir. BAP 1988).  "Yet, 'when assessing a debtor's good faith, the bankruptcy court "should examine the debtor's financial status [and] motives . . .".'"  *In re Bootjack Dairy M&D, LLC*, 654 B.R. 368, 385 (Bankr. D. Idaho 2023) (quoting *Sullivan*, 522 B.R. at 615).  In *Bootjack Dairy*, the Court dismissed a chapter 12 bankruptcy of a debtor who operated a dairy farm.[6]  *Id.* at 390.  There, the debtor had assets totaling over $5,000,000 and liabilities of approximately $3,600,000.  *Id.* at 377.  Prior to filing for bankruptcy, the debtor had entered into a contract with a separate entity to purchase the debtor's business.

---

[5] Debtors point to a provision in the V Dot partnership agreement that calls for the termination of the partnership upon the bankruptcy filing of any general partner.  *See* Ex. 101. The Court takes no position as to the effect of this bankruptcy on V Dot.

[6] While the *Bootjack Dairy* decision involved a chapter 12 debtor, the analysis of a chapter 12 dismissal is very similar to the analysis in chapter 11.

MEMORANDUM OF DECISION- 9

The debtor later regretted the deal, and after the entity sued the debtor in state court for specific performance, the debtor filed for chapter 12 bankruptcy. Ultimately, the Court determined that the debtor did not have a valid bankruptcy purpose in deciding to file for bankruptcy, noting both that the debtor had a fairly healthy financial condition and that the debtor's dispute with the purchasing entity could, and should, be dealt with in state court.[7] *Id.* at 385–390.

    Here, like in *Bootjack Dairy*, Debtors are solvent and in stable financial condition, as their assets far outweigh their liabilities, and their monthly income exceeds their expenses. Debtors attempt to distinguish this case from *Bootjack*, asserting that *Bootjack* only had one creditor while here Debtors have several creditors. However, Debtors still have a very limited number of creditors and, as noted above, several creditors are entities owned and operated by Debtors' family. Further, while Debtors may have a few more creditors than what was present in *Bootjack*, Debtors testified that no creditor had made any attempt to collect its debts prior to the filing of the petition and Debtors were able to timely make all their payments. As such, the Court finds the *Bootjack Dairy* case instructive here.

    Debtors further argue that while they are not in financial distress now, they need to rearrange their debts, given Mr. Little's serious health problems. Debtors assert they will soon have significant health care related expenses. Courts have recognized filing a

---

[7] In *Bootjack Dairy*, Judge Meier also cited to similar cases where courts found bad faith involving solvent debtors attempting to avoid state court litigation. *See Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440 (9th Cir. 1986); *see also Silberkraus*, 253 B.R. at 902-03.

MEMORANDUM OF DECISION- 10

chapter 11 bankruptcy to address imminent debts, such as in mass-tort litigation cases. *See In re LTL Management*, 64 F.4th 84 (3d Cir. 2023).

Mr. Little has COPD and Parkinson's. Currently, Mr. Little receives care from his wife, but he will likely need more extensive care someday. An executive director at a skilled nursing facility in Emmett, Idaho, testified that given Mr. Little's health condition, he will likely need significant services, which could cost between $10,000 and $20,000 per month.[8] *See* Ex. 109. The Oxarangos question Debtors' explanation for filing bankruptcy, pointing out the several expenses Debtors could reduce or eliminate if they were truly concerned about future health care debts, such as maintaining a rarely used vacation property in McCall and the training and maintenance of Mrs. Little's horses. Additionally, testimony indicates Debtors lease 22 acres of land to one of their daughters for approximately $400 a month and allow the daughter to have all the proceeds associated with that land.

Further, Debtors' future expenses remain speculative at best. There is no timeline for when Mr. Little will need this level of care and it does not appear that Debtors have taken many concrete steps to explore this possibility beyond meeting with a representative of a skilled nursing facility in the area.[9] As such, given these circumstances and Mr. Little's clear testimony that they filed this bankruptcy to cause the

---

[8] There was little testimony regarding what impact insurance may have on Mr. Little's medical care, so it remains unclear whether Debtors would have to pay this entire amount should Mr. Little need care.

[9] In their testimony, both Debtors also appeared resistant to the idea of Mr. Little needing such high levels of care outside the home. While such decisions are fraught with complicated considerations, the contradictory testimony offered by Debtors causes the Court to question whether the potential health care expenses associated with Mr. Little's future care was a motivating factor in filing this bankruptcy.

MEMORANDUM OF DECISION- 11

dissolution of V Dot, the Court finds Debtors' argument that they filed bankruptcy to deal with future health care expenses pretextual. Rather, given the record, it seems clear that Debtors' motivation in filing this bankruptcy case was to delay the dismissal of the state court litigation and to cause the dissolution of V Dot.

While neither Debtors' solvency nor the two-party dispute are by themselves dispositive of Debtors' bad faith, both the Oxarangos and the United States Trustee have argued persuasively that, in light of all the circumstances and the *Bootjack Dairy* decision, these factors indicate Debtors filed their chapter 11 bankruptcy case without a valid bankruptcy purpose. Debtors do not appear to be utilizing the bankruptcy court to obtain a fresh start or reorganize their debts. Rather, Debtors' bankruptcy was filed in an attempt to force the dissolution of V Dot, which Mr. Little operated with the Oxarangos, and in an attempt to obtain a more favorable outcome in their ongoing litigation with the Oxarangos. These alone are not valid purposes for filing bankruptcy. Moreover, these issues could, and should, be addressed by nonbankruptcy law. As such, the Court finds cause to dismiss Debtors' bankruptcy.

### 3.    Dismissal

Though the Court has determined that there is cause for conversion or dismissal, under § 1112(b)(2), the Court may not convert or dismiss the case if there are "unusual circumstances establishing that converting or dismissing the case is not in the best interest of creditors and the estate." The party opposing dismissal or conversion has the burden of establishing "unusual circumstances." *McKay*, 2013 WL 66263, at *3. "Unusual circumstances" is not defined in the Code. However, as noted in *In re Keeley*

MEMORANDUM OF DECISION- 12

& *Grabanski Land P'ship*, 460 B.R. 520, 536 (Bankr. D.N.D. 2011),"the phrase contemplates conditions that are not common in Chapter 11 cases" which would demonstrate that maintaining a chapter 11 case would be proper.  Here, Debtors have not presented any unusual circumstances that would warrant a finding that dismissal or conversion is not in the best interest of creditors.  As such, the Court must consider whether conversion or dismissal is appropriate in this case.

Both the United States Trustee and the Oxarangos have asserted that dismissal is in the best interest of creditors.  Further, the Ninth Circuit has held "immediate dismissal [is] the only appropriate course once the court [finds] that the petition was filed without legitimate purpose." *Marsch*, 36 F.3d at 829.  As such, because the Court has found that Debtors filed this bankruptcy in bad faith without legitimate purpose, dismissal is the only appropriate outcome here.

**CONCLUSION**

For the forgoing reasons, the United States Trustee and the Oxarangos' motions to dismiss, Doc. Nos. 33 & 45, are granted pursuant to § 1112(b).  The Court will enter an order consistent with this decision.

DATED:  February 9, 2024



_____
NOAH G. HILLEN
Chief U.S. Bankruptcy Judge

MEMORANDUM OF DECISION- 13